# ST. LOUIS MINING AND MILLING COMPANY, Respondent, *v.* THE MONTANA COMPANY (LIMITED), Appellant.

Constitutional Law — *Statutory construction* — *Mining claims* — *Examination of mining property* — *Certiorari.* — Section 376, first division, Compiled Statutes, provides for the inspection, examination, and survey of lode mining claims, upon an order of the District Court made upon the petition of any party having any right to or interest in such mining claim, where such examination or survey is necessary to protect such right or interest, upon notice to the adverse party in possession of such claim. *Held,* that the authority bestowed by this statute does not empower the District Court to grant an order that may be made unjust or oppressive, nor does it deprive the adverse party of his property without due process of law, and is therefore not unconstitutional, though it does not require the interest of the petitioner to be defined, and permits such examination before the commencement of any action by the parties and without bond, as such proceeding is the proper mode of securing the best evidence of which the case in its nature is susceptible, and though it does not provide for an appeal from such order, as the proceedings may be reviewed by the writ of *certiorari.*

*Appeal from First Judicial District, Lewis and Clarke County.*

An order for the examination and survey of defendant's property was made by Hunt, J. Defendant appeals from the order, and also applied for a writ of *certiorari* to review an order of the District Court, finding defendant's manager guilty of contempt of court for refusing to obey the order appealed from.

*Cullen & Sanders,* for Appellant.

The obnoxious features of section 376 are apparent at a glance. The quality of the " right or interest in " the mining claim to be shown by the petitioner is not defined. If issue is joined upon the allegations in the petition that the petitioner has an interest, it raises a question of fact which ought to be determined by a jury, unless the parties expressly waive their constitutional right to a trial by jury. This is a deprivation of the right to trial by jury and the sacrifice of important interests. Without any ascertainment of the rights of the parties, save what may be made by the judge on *ex parte* affidavits, a mine owner may be damaged to an unlimited extent; his property may be practically confiscated, and yet there is no relief or redress for him. No bond is required to be given to cover damages resulting from this invasion of his rights, nor is there any appeal allowed

by the statute from the action of the judge or court in granting the prayer of the petition. The injury may be absolutely incalculable. It may amount practically to a confiscation of the property. No appeal is provided for by the section under consideration, and if any exists it is by virtue of the provisions of the first subdivision of section 421 of the Code of Civil Procedure, which allows an appeal "from a final judgment in an action or special proceeding." Even if it should be held that the order granting the relief prayed for by the petitioner was a final judgment within the meaning of this section, and that under it an appeal to this court might be taken, the relief is not adequate. There is no method of staying the execution of the order pending the appeal. Our Constitution provides (§ 3, art. viii.) that "the appellate jurisdiction of the Supreme Court shall extend to all cases at law and in equity." The Supreme Court of California, under a similar provision found in the constitution of that State, held that a special proceeding, being neither a case at law nor in equity, an appeal would not lie. (*Appeal of Houghton,* 42 Cal. 36.) The petitioner claims an extralateral right in the Marble Heart because there is a lead having its apex within the surface boundaries of his claim, which, in its downward course, passes out of the east side line of his claim and into the surface boundaries of the Marble Heart. In this controversy this defendant has no part, or lot, or interest of any kind or character whatever, and yet if this section of the statute is law — is constitutional — it may be deprived of the use and enjoyment of its great property in order that this petitioner may ascertain what his rights are in the Marble Heart. Can this be "due process of law" within the meaning of section 27 of article iii. of our Constitution, or of the Fourteenth Amendment to the Constitution of the United States? (*Dartmouth College* v. *Woodward,* 4 Wheat. 519; *Bank of Columbia* v. *Oakly,* 4 Wheat. 244; *Westervelt* v. *Gregg,* 12 N. Y. 209; 62 Am. Dec. 160; *Penoyer* v. *Neff,* 95 U. S. 97, 704–733; *Davidson* v. *New Orleans,* 96 U. S. 97–104; *Den* v. *Hoboken etc. Co.* 18 How. 276; *Chauvin* v. *Valiton,* 8 Mont. 458; *Bank of the State* v. *Cooper,* 2 Yerg. 599; 24 Am. Dec. 517–522; *Brown* v. *Hummel,* 6 Pa. St. 86; 47 Am. Dec. 434.) In determining the constitutionality of this statute the question is not

what abuses the particular case presents, but what abuses may or can result from the enforcement of the law in any case. (*Stuart* v. *Palmer*, 74 N. Y. 183; 30 Am. Rep. 289; *Ex parte Grace*, 12 Iowa, 208; 79 Am. Dec. 533; 4 Kent Com. [9th ed.] 621 ; Story on Constitution, 264, 661 ; *Taylor* v. *Porter*, 4 Hill, 140; 40 Am. Dec. 274; Cooley's Constitutional Limitations [5th ed.], 436; *Lenz* v. *Charlton*, 23 Wis. 478.) The word "property," as used in the constitution, is defined to be the right to have, use, enjoy, and dispose of a thing, and this right may be violated without a physical taking of the property, or any attempt to transfer its title from one to another. (7 Hare Am. Com. Law, 759; *Wynehamer* v. *People*, 13 N. Y. 433; *In re Jacobs*, 98 N. Y. 105; 50 Am. Rep. 636; *People* v. *Otis*, 90 N. Y. 48; *People* v. *Gillson*, 109 N. Y. 400; 4 Am. St. Rep. 465.) There are six and only six methods by which the State may legitimately exercise power over private property, and these may be briefly classified as follows: (1) It may regulate the making of contracts with reference to property. (2) It may take property from an individual to compel the fulfillment of a moral or legal obligation. (3) It may deprive him of his property by way of punishment for a violation of law. (4) It may regulate the use of his property under the police power. (5) It may deprive him of his property for the payment of taxes. (6) It may take it for a public use under the law of eminent domain. (Lewis on Eminent Domain, § 2; Cooley's Constitutional Limitations, 477.) To justify the making of an order for an inspection, examination, or survey, the petitioner must establish the fact that he has " a right to or an interest in" the lead, lode, or mining claim so to be examined or surveyed, or that he is the owner of another mining claim, and that it is necessary for the purpose of protecting, ascertaining, and enforcing his rights in such claim, that he should be permitted to inspect, examine, or survey another mining claim belonging to his neighbor. In either case there is a question of ownership—of right or title to real estate to be found by the court. At common law the question of title to real estate could only be tried by a jury, and when the Constitution (art. iii. § 23) declares that the right to trial by jury shall remain inviolate, it cannot mean less than that in those cases which were only triable by

jury at common law, the parties shall be entitled to a jury trial, unless the right is expressly waived in the manner pointed out in the constitution itself. The right seems to be an absolute one in many of the States, and entirely beyond the discretion of the court to grant or refuse. (*Faulk* v. *Faulk*, 23 Tex. 653; *Taylor* v. *Person*, 2 Hawks, 298; *Mounce* v. *Byars*, 11 Ga. 180; *Brown* v. *Burke*, 22 Ga. 574.)

*McConnell & Clayberg*, of counsel, for Respondent.

There is but one question relied upon by appellant, viz., the constitutionality of section 376, under which the proceeding was instituted. Upon the question that the law is unconstitutional because it may become oppressive, we find a better argument than we are able to make in Cooley's Constitutional Limitations (5th ed.), page 197, et seq., and cases cited. We adopt what is said by Judge Cooley as our argument without further reference. As to the act being partial, special, or class legislation, Judge Cooley sums up the doctrine with reference to this class of legislation as follows: "If the laws be otherwise unobjectionable, all that can be required in these cases is that they be general in their application to the class or locality to which they apply, and they are then public in character, and of their propriety and character the legislature must judge." (Cooley's Constitutional Limitations, 483, and cases cited.) No appeal is granted by the terms of the act. The right of appeal is purely a statutory right and not a constitutional right. Therefore the legislature has full power to give this right in such cases as it may see fit, and where it is not given it does not obtain. (Cooley's Constitutional Limitations [5th ed.], 474; *Grissler* v. *Fowler*, 55 N. Y. 675; *Hewlett* v. *Elmer*, 103 N. Y. 156; *Maxfield* v. *Freeman*, 39 Mich. 64.) Is the statute void because no security is required of the petitioner to pay damages in case it is afterwards ascertained that no right of investigation exists? It would be a very peculiar doctrine to hold that in all cases a bond or other security should be required before any proceedings might be instituted in any court. Laws of that kind are never passed, and the furthest the legislatures have ever gone is to provide that upon certain showings being made by the defendant, the plaintiff might be required to give security. (*Marsh*

*v. Steele,* 9 Neb. 96; 31 Am. Rep. 406.) It is claimed by the respondent that because the law does not give the party the right of trial by jury it is in violation of section 23, article iii. of the Constitution of the State of Montana, which provides that the right of trial by jury shall remain inviolate. This provision is similar to that in the constitutions of almost all other States, and has received judicial construction under a variety of circumstances, and it has been invariably held that it means, that in whatever cases the right of trial by jury was allowed prior to the adoption of the constitution, such right should continue in such cases. The courts have just as universally held that such provision does not apply to cases where no right of trial by jury was given prior to the adoption of the constitution, nor to proceedings established after the adoption thereof. (*Lee v. Tillotson,* 24 Wend. 336; 35 Am. Dec. 624; *Ross v. Irving,* 14 Ill. 171; *Ex parte Carpenter,* 64 Cal. 267; *Flint River Co. v. Foster,* 5 Ga. 194; 48 Am. Dec. 248; *Lake Erie etc. R. R. Co. v. Heath,* 9 Ind. 558; *Whallon v. Bancroft,* 4 Minn. 109; *Work v. State,* 2 Ohio St. 297; 59 Am. Dec. 671; *Gaston v. Babcock,* 6 Wis. 490; *Stilwell v. Kellogg,* 14 Wis. 461; *Frazee v. Bratton,* Mar. 19, 1887, 2 S. E. Rep. 125.) The following cases are upon proceedings involving rights of neither an equitable nor maritime jurisdiction, in which it was held that the parties were entitled to a jury trial: *Livingston v. Mayor etc. of New York,* 8 Wend. 85; 22 Am. Dec. 622; *Whallon v. Bancroft,* 4 Minn. 109; *People v. Mayor etc. of Brooklyn,* 4 N. Y. 419; 55 Am. Dec. 266; *Atherton v. Sherwood,* 15 Minn. 221; *Gaston v. Babcock,* 6 Wis. 503; *Ross v. Irving, supra; Stilwell v. Kellogg, supra; Sheppard v. Steele,* 43 N. Y. 52; 3 Am. Rep. 660; *Shirley v. Lunenburg,* 11 Mass. 379; *Crandall v. James,* 6 R. I. 144; *Frazee v. Bratton, supra.* There is no trial of any title to real estate authorized under this proceeding. It simply allows a person to compel the opposite party to produce evidence wholly and solely within his charge, so that the rights of the parties may be settled in future litigation. It is not trying the title to anything, and the order of the court or judge allowing such investigation to be made is not *res adjudicata* as between the parties in any proceedings relative to the title to the property. Counsel is mistaken in his position that at com-

mon law the question of title could only be tried by jury. Titles were not always tried by jury at common law. (*Ellithorpe* v. *Buck*, 17 Ohio St. 75.) Is the law unconstitutional because it deprives a person of his property without due process of law? Perhaps no question under the constitution of the United States, or the constitutions of the several States, has received judicial construction more frequently than this, and no perfect definition has yet ever been successfully attempted, but each case is construed to stand upon its own particular facts. Justice Miller, in *Davidson* v. *New Orleans*, 96 U. S. 97, determines that it is impossible to define the words "due process of law," so that such definition would cover every exercise of the power thus forbidden to the State, and exclude those which are not. As somewhat illustrating the different classes of cases and the opinions of the courts, we cite the following: *Hurtado* v. *California*, 110 U. S. 516; *Walker* v. *Sauvinet*, 92 U. S. 90; *Kennard* v. *Louisiana*, 92 U. S. 480; *Railroad Tax Cases*, 13 Fed. Rep. 782, and note. The exercise of the right given by the statute does not amount to a taking of the property within the meaning of the constitution. In order that property be *taken* within the meaning of the constitution, there must be a permanent deprivation of the owner of his property, either by physical taking or by interference with the use and enjoyment. (*Winslow* v. *Gifford*, 6 Cush. 327; *State etc. Land Co.* v. *Seymour*, 35 N. J. L. 47.) The rights given by this statute are not new ones, but have been recognized by the common law for almost a century, and the statute itself is simply declaratory of the common law in this regard, giving a specific mode of procedure. (*Thomas Iron Co.* v. *Allentown M. Co.* 28 N. J. Eq. 77; *Lewis* v. *Marsh*, 8 Hare, 97; *Bennett* v. *Whitehouse*, 28 Beav. 119; *Bennett* v. *Griffiths*, 30 Law J. Q. B. 98; *Whaley* v. *Brancker*, 8 Morrison Min. Rep. 21; *Earl of Lonsdale* v. *Curwen*, 7 Morrison Min. Rep. 693; *Stockbridge Iron Co.* v. *Cone Iron Works*, 102 Mass. 80.)

Brief of *E. W. Toole*, of counsel, for Respondent.

It is claimed by counsel that the law is one of unusual hardship, and might be used as an engine of oppression and injustice. The powers conferred by the act are only such as would

have been possessed by the court below in the exercise of its chancery jurisdiction without it. That this power may be abused is an argument, if argument at all, that is applicable in all cases. It is simply making the necessary use of the only accessible means employed in the perpetration of a fraud and commission of a trespass, in the possession and control of the wrong-doer, to ascertain the extent of the injury and damage he has done. It makes the person, who by secret means is committing a wrong, produce the evidence thereof which he alone possesses. The appellant, a foreign corporation with immense machinery and works, is engaged in gutting the mine of respondent at great depth under-ground. Possessing the only means of ascertaining the facts sufficient to authorize a recovery, it virtually says, by resisting the petition, it will not permit the use of those means. The statute, we claim, is based especially upon equitable principles. It makes the party having the only evidence in his possession to permit it to be produced, and requires the use of every means employed in the destruction of the property of his neighbor in the production of that evidence.

Bonds given in any case are not creative of the right, but a part of the remedy, as a precautionary step in legal or equitable proceedings. It can contribute nothing in determining the constitutionality of a law like this.

The fact that the statute fixes the minimum of time allowed for the notice does not enlarge the powers, or subject it to greater abuses than if no limitation was had, and the matter was left, as it otherwise would have been, to the discretion of the chancellor. (*Stockbridge Iron Co.* v. *Cone Iron Works*, 102 Mass. 80, et seq.; Tiedman on Limitations of Police Powers, 207, § 89.) This is emphatically a bill filed for the purpose of obtaining an order for the production of testimony, and the order is in the nature of an interlocutory order, because in contemplation of litigation and essential to the trial of the rights involved. It involves the question of the power to require the production of the best evidence in furtherance of judicial proceedings. It is insisted that a suit should be pending at the time the order is made. It is difficult to see what difference it makes whether the order is granted in an independent proceeding in view of an action, or upon petition during the pendency of an action. If

the evidence is essential it must be had beforehand, or at least during the trial. In every instance it must precede the judgment and verdict. According to the views expressed by counsel, appellant is entitled to a jury trial, and the condemnation of, and payment of damages for the use of its work before such an order could be made. This is fallaceous for two reasons: 1st. Condemnation could only be had for a public purpose; and 2d. It would require the same identical testimony in question to show the necessity for it if it could be condemned for private uses. It is tantamount to saying that the merits of the controversy to be settled between the parties should be first tried, and the order be made a part of the decree. In other words, you cannot get a judgment or decree without the evidence, and you are not entitled to the evidence until you get your judgment or decree, i. e., you have no rights at all. The converse of the position of counsel is entitled to far more consideration upon constitutional grounds than the position taken. The only question is, is it the best evidence, and is it absolutely necessary in maintaining justice? If so, withholding it is defeating the ends of justice. Should the legislative assembly have sought to take away a remedy absolutely essential to the enjoyment of the right, it would have been nothing short of confiscation. Conceding that in a common law action this could not be done for the reasons cited by counsel for appellant, equity then comes to the rescue in securing even and exact justice. It is a doctrine familiar to the practitioner in the Territories that the chancery power conferred upon the district judges under the organic act, is such as is exercised by the courts of chancery in England, and that the mode of its exercise may be defined by the legislative assembly as is here done, but that it cannot take away the jurisdiction. What then were the powers of the courts of equity under its system of jurisprudence in England? Upon this question see *Bennett* v. *Whitehouse*, 28 Beav. 119; S. C. 8 Morrison Min. Rep. 17; *Lewis* v. *Marsh*, 8 Hare, 97; *Walker* v. *Fletcher*, 3 Bligh, 172; *Bennett* v. *Griffiths*, 30 Law J. Q. B. 98; *Bennett* v. *Griffiths*, 8 Morrison Min. Rep. 21; *Whaley* v. *Braucker*, 10 L. T. N. S. 155. This right is to prevent a forfeiture and sacrifice of property, and is based upon the same principle of an order and injunction to permit the representation of a mine

when a representation is required.   Such right and power either exists in the court by statute, or is otherwise exercised by reason of its equitable powers.   (*Thornburg* v. *Savage M. Co.* 1 Pac. L. Mag. 267; *Thomas Iron Co.* v. *Allentown M. Co.* 28 N. J. Eq. 77; *Sacramento etc. M. Co.* v. *Showers,* 6 Nev. 291.)   The Supreme Court of Nevada recognized the equitable powers before the passage of the statute of that State.   California, Colorado, Nevada, Idaho, and Montana all have statutes similar in so far as the questions here involved are concerned, and their validity has not been questioned.   (See, also, 1 Pomeroy's Equity Jurisprudence, 197, 198, 201, 205, 216, 230; 3 Greenleaf on Evidence [13th ed.], § 328; *Kynaston* v. *East India Co.* 3 Swanst. 249; Hunt on Boundaries and Fences, 67; *Comstock* v. *Apthorpe,* 8 Cowen, 386.)

Blake, C. J. — The St. Louis Mining and Milling Company of Montana filed its petition in the District Court of Lewis and Clarke County, and alleged that the petitioner is a corporation under the laws of Montana; that the Montana Company, Limited, is a corporation under the laws of Great Britain; that the petitioner is the owner of the St. Louis Quartz Lode Mining Claim, situated in said county; that the Montana Company, Limited, is the owner of the Marble Heart, the Maskelyne, and the Nine Hour Quartz Lode Mining claims; "that being desirous of, and it being necessary for your said petitioner . . . . to have an inspection, examination, and survey made of the premises last aforesaid, in order to enable it to institute its action to recover the possession of the said property, so owned by it, and for the recovery of such damages as it may have sustained by reason of the taking, extraction, and conversion of the quartz rock, ore, and mineral, taken by the said Montana Company, Limited, from the mining claim and premises, so owned by your petitioner, and for the purposes of enabling it to have such inspection, examination, and survey made of its said premises, and of all veins or deposits of mineral-bearing quartz rock or earth in place, the apices of which are within the surface boundaries of the St. Louis Mining Claim, . . . ." a notice was served upon the Montana Company, Limited, which is made a part of the petition; that the Montana Company, Limited, is in the

possession of "certain tunnels, shafts, stopes, winzes, drifts, and excavations within the planes of the exterior boundaries of the said Marble Heart, Maskelyne, and Nine Hour Lode Mining claims, extending vertically downward, and beneath the surface of the said claims, and upon veins or deposits of ore, the apices of which are within the exterior boundaries of the St. Louis Quartz Lode Mining Claim" and has been extracting large quantities of ore belonging to the petitioner; that the said tunnels, shafts, stopes, winzes, drifts, and excavations of the Montana Company, Limited, connect with the said St. Louis Mining Claim, and are the only means for entering into the same; "that the inspection, examination, and survey thereof was and is absolutely requisite and necessary in order to determine the rights of the respective parties, and to ascertain the extent of the trespass, damage, and injury occasioned by the said wrongful and unlawful acts of the said Montana Company, Limited, in so entering the premises of your petitioner, and extracting the quartz, rock, ore, and mineral from same, and in constructing their said tunnels, shafts, stopes, winzes, drifts, and excavations thereon; that for said purpose it was and is necessary that your petitioner, and such persons as may be designated by this court, shall have access to and in the shafts, works, and machinery, convenient or necessary to make the inspection, examination, and survey aforesaid," of which the Montana Company, Limited, is in the possession.

The prayer of the petitioner is as follows: "Wherefore, your petitioner prays that your honor appoint a time and place for hearing this petition, and that an order for service of notice thereof upon the said Montana Company, Limited, be made; that such proceedings be had and done under section 376, aforesaid, as will secure to your petitioner the rights to which it is entitled in pursuance thereof, and that upon such hearing an order be made for the inspection, examination, and survey, so refused to your petitioner, and that the persons appointed by your honor shall have free access to the premises aforesaid."

The notice which is mentioned contained recitals of facts similar to those of the petition, and was a demand for an inspection, examination, and survey of the under-gound works of the said lode mining claims of the Montana Company, Limited. The

petition was filed November 6, 1889, and the judge ordered that the hearing be had five days thereafter. The Montana Company, Limited, appeared and filed an answer, which denied the allegations of the petitioner.

The court below made an order " that an inspection, examination, and survey of the shafts, tunnels, levels, works, and stopes be made as prayed for," continuing twenty days, and designated eight persons to make the same; that " said party shall have the right to pass in and out the mouths of the tunnels of the defendant without hindrance;" that " said work shall be completed within said twenty days, unless for good cause the court shall order a longer time to be used ;" the survey by the said petitioner to be confined within the vertical planes of the end lines of the St. Louis Mining and Milling Company's claim, except so far as it may be necessary to run lines in the tunnels, levels, stopes, drifts, or winzes outside of such planes, in order to complete an accurate survey of said workings within the said end lines; ". . . . the petitioner's survey to be conducted, so far as possible, without interference with the regular and orderly working and operation of the mine, or the employees of defendant in the discharge of their various duties; and the engineer of the party of petitioner shall not dispose of or sell to any one any plan or section of said mine, or any matter or *data* obtained during or resulting from this survey, except to the petitioner, its agents and attorneys. Petitioner's surveyors are not to enter said mine unless accompanied by three representatives appointed by the defendant to accompany them, unless after reasonable notice, not to exceed one hour, such persons shall fail to attend. The persons so hereinbefore authorized to make such survey shall not take or remove from said mine any samples of ore or minerals at any point therein, but they shall be allowed to examine and trace the walls of the vein or fissure, and for this purpose they shall be allowed to use the pick, and remove such material as shall enable them to make such examination."

Afterwards, R. T. Bayliss, the general manager and superintendent of the Montana Company, Limited, and who was in the control of the property which is described in the foregoing order, refused to comply therewith, or permit said persons to make the survey. Upon proper proceedings had in the premises, Bayliss

was arrested, and pleaded guilty to the charge of contempt of the court, and was punished by a fine.   The Montana Company, Limited, appeals to the court from the "final judgment and order . . . . allowing an inspection, examination, and survey of the Marble Heart, Maskelyne, and Nine Hour Quartz Lode Mining claims, . . . . duly made and entered in said action . . . . in favor of the above-named petitioner, and against this defendant, and from the whole and every part thereof."   Upon the application of the Montana Company, Limited, a writ of *certiorari* was issued out of the court to the District Court, commanding it to certify fully to this court, and annex to the writ a transcript of the record and proceedings referred to, that the same might be reviewed.

The argument upon this hearing has been restricted to one question.   Counsel concede that all the proceedings in the court below have been regular in form, and derive their validity from the following section of the Code of Civil Procedure: "Whenever any person shall have any right to or interest in any lead, lode, or mining claim which is in the possession of another person, and it shall be necessary for the ascertainment, enforcement, or protection of such right or interest that an inspection, examination, or survey of such mine, lode, or mining claim should be had or made; or, whenever any inspection, examination, or survey of such lode or mining claim shall be necessary to protect, ascertain, or enforce the right or interest of any person in another mine, lead, lode, or mining claim, and the person in possession of the same shall refuse, for a period of three days after demand therefor in writing, to allow such inspection, examination, or survey to be had or made, the party so desiring the same may present to the District Court, or a judge thereof, of the county wherein the mine, lead, lode, or mining claim is situated, a petition, under oath, setting out his interest in the premises, describing the same; that the premises are in the possession of a party, naming him; the reason why such examination, inspection, or survey is necessary; the demand made on the person in possession, so to permit such examination, inspection, or survey; and his refusal so to do.   The court or judge shall thereupon appoint a time and place for hearing such petition, and shall order notice thereof to be served upon the adverse party, which notice shall

be served at leased one day before the day of hearing.  On the hearing, either party may read affidavits; and if the court or judge is satisfied that the facts stated in the petition are true, he shall make an order for an inspection, examination, or survey of the lode or mining claim in question, in such manner, at such time, and by such persons as are mentioned in the order.  Such persons shall thereupon have free access to such mine, lead, lode, or mining claim for the purpose of making such inspection, examination, or survey, and any interference with such persons while acting under such order shall be contempt of court.  If the order of the court is made while an action is pending between the parties to the order, the costs of obtaining the order shall abide the result of the action; but all costs of making such examination or survey shall be paid by the petitioner."  (§ 376.)

It is contended that this statute is unconstitutional, and authorizes the inspection, examination, and survey of the mining property of the Montana Company, Limited, upon the petition of the St. Louis Mining and Milling Company of Montana, and before the commencement of any action by the parties.  The obnoxious features are pointed out in the brief, and may be summarized under the following heads: This law may be made an instrument of oppression and injustice.  The quality of the interest of the petitioner is not defined.  No bond is required to be given to secure the payment of the damages which may result to the owner of the property which is invaded.  No appeal is allowed from the order of the court or judge in granting the prayer of the petitioner.  The power of the court or judge is vast, and can practically confiscate any mine in the State.  The innocent owners of mining property are injured without "due process of law," and arbitrarily deprived of the right of trial by a jury.  The commanding position of the mineral interests of this State, and the importance and extent of this remedy which is applicable to them, demand the careful study of the principles which have been invoked by counsel.

Before we investigate the propositions which have been announced, it will be instructive to ascertain the origin of this provision of the Code, and thereby discover its purpose.  The source is unquestionably found in the chancery practice of England, and we must review the cases which are generally controversies

affecting coal lands.   In the *Earl of Lonsdale* v. *Curwen*, 3 Bligh
O. S. 168, an order was made in the year 1799 that the plaintiff
and his servants "should be at liberty to inspect the workings
of the defendant under the plaintiff's enclosures."   It is shown
by affidavits that an inspection of the premises was then pre-
vented "because the pipe or air course which conveyed the pure
air had been broken down or taken away, and certain earth,
rubbish, and other impediments were lying at the ends, roads,
or passages leading to the workings."   It was thereupon further
ordered that "the defendant should cause the obstructions to be
removed, and open the air courses as the viewers should think
necessary for such inspection; and that the viewers, and such
other persons as they should appoint, should be at liberty, as
often as should be necessary, to make from time to time inspec-
tions into the workings of the defendant under the premises of
the plaintiff, so as to enable the viewers to make a perfect and
complete report of the workings."   In *Walker* v. *Fletcher*, 3
Bligh O. S. 172, the same proceedings were had in the year
1804, and it was also ordered that the defendants should remove
certain dams and obstructions in their works as the inspectors
should direct, so that the plaintiff might view the pit of the
defendants.   In *Blakesley* v. *Whieldon*, 1 Hare, 176, the parties
entered, in the year 1838, into a contract for the sale of minerals
situated on certain tracts of land.   Differences arose as to whether
the plaintiff should have power to go down into any of the mines
comprised in the contract, or whether the power, if granted,
should not be confined to the right to descend any pits or shafts
sunk on the land over the demised mines.   In pursuance of the
opinion of the vice-chancellor, a decree was entered, "empower-
ing the plaintiff and his agents, at all reasonable times, and upon
reasonable notice, to enter the mines in the pleadings mentioned,
and to inspect and measure the same, so far as from time to time
may be necessary."   The vice-chancellor observed that the evi-
dence proved "that the power of inspection was an unusual reser-
vation in cases like the present."   In *Lewis* v. *Marsh*, 8 Hare,
97, a bill was filed by the lessors of a colliery against the les-
sees, and heard in the high court of chancery in the year of 1849.
It appears that "there was no provision for inspection in the
lease, and the defendants had worked the coal through a shaft in

an adjoining mine belonging to themselves, so that the demised mine could only be entered through the defendants' mine." Counsel "moved that the defendants might be ordered to permit the plaintiffs, and certain persons mentioned in the notice of motion, all or any of them, with workmen and other necessary assistants, at all reasonable times, and from time to time, to have access to the coal works of the plaintiffs in and through the adjoining coal works of the defendants, to inspect and examine the said coal works, the property of the plaintiffs, and to ascertain the real extent, state, and condition thereof, and the real weight of the coal from time to time worked by the defendants therefrom." They submitted that they "were entitled to the means of proving the fact that the defendants had worked beyond their boundary." The defendants opposed the motion, upon the ground that "the plaintiffs might, if they had desired any such power of inspection, have reserved it in their lease; but they had made no such contract. . . . . The plaintiffs sought not only to inspect the demised coal works, but also to pass for that purpose into and through the property of the defendants. No implied contract gave the plaintiffs such a right. Admitting that a power of inspecting their own mine might be impliedly reserved, it must be exercised in a lawful way, at their own expense. The plaintiffs might open a shaft, and descend into the mine, upon their own property; that must be the extent of their legal right under the contract." The vice-chancellor, in the opinion, says: "I think the case is one in which there is a necessity that the party should be allowed what he asks, in order to prove his case. That is the meaning of necessity. A party cannot get his rights without proving what his rights are; and it is inherent in the case that the plaintiffs should have an opportunity of ascertaining that the defendants do not work more coal than they are entitled to do. . . . ." The order of the court is similar to that in *Blakesley* v. *Whieldon, supra.* The defendants objected to the admission into their mine of certain persons mentioned in the notice of the motion, and the plaintiffs consented to withdraw them; "and it is ordered that the defendants do permit the said plaintiffs, and the persons so to be appointed, . . . . to have access to, and to view and inspect the said mine and workings; but this order is not to entitle the plaintiffs to

view or inspect any part of the defendants' mine except for the purpose of ascertaining the boundary of the plaintiffs' mine."

In *Bennitt* v. *Whitehouse*, 28 Beav. 119, the master of the rolls says, in the opinion: "It is established by the cases that, if a person is making use of his property to the injury of the property of his neighbor, the latter is entitled to an inspection, in order to ascertain the extent of the injury; and this court only requires him to show a *prima facie* case. . . . . If it were a question depending only on the balance of testimony, I should, in this case, be in favor of the defendant. But the court requires the best evidence of the fact, and the best evidence here is by an examination of the workings in the defendant's mine. Suppose a man had a right to the surface, and that another person was entitled to the minerals; if the latter insisted that the former had sunk a shaft, and was obstructing his minerals, would not this court allow an inspection, in order that the facts in dispute might be ascertained? I have acted upon that principle in *Adshead* v. *Needham*, in which I allowed the plaintiff to go through a gallery in the defendants' mine in order to inspect it. . . . . Whenever it appears that a person has power to make use of his land to the injury of another, and there is *prima facie* evidence of his doing so, though it is contradicted, still, as the only way of ascertaining the fact is by an inspection, the court always allows it, if it can be done without injury to the defendant."

In *Bennett* v. *Griffiths*, 30 Law J. Q. B. 98, the judgment of the court was delivered by Cockburn, C. J., who said: "The power to order an inspection of real or personal property has long existed in the courts of equity, and we find that as ancillary to that power, the courts · of equity have ordered the removal, where necessary, of obstructions to the inspection. In the notes to the *East India Co.* v. *Kynaston*, 3 Bligh O. S. 153, 168, two cases are referred to in which, under circumstances very similar to the present, such orders were made." The learned judge then cites and approves the cases of *Earl of Lonsdale* v. *Curwen, supra,* and *Walker* v. *Fletcher, supra,* and adds the following observation: "This latter case, which was decided in the time of Lord Eldon, is a strong assertion of the power to remove obstructions to inspection." (See, also, *Whaley* v. *Braucker*, 10 L. T. N. S. 155.)

The English authorities which have been collated will be considered further, and we will now notice the American cases to which our attention has been invited. The earliest that we have read is *Thornburg* v. *Savage Mining Co.* 1 Pac. L. Mag. 267, which was decided in the year 1867, in the Circuit Court of the United States for the district of Nevada. The main issue was whether the property claimed by the plaintiff was a separate and distinct quartz lode from the vast mineral vein, which is known as the "Comstock Lode," and a petition was filed praying for an inspection of the premises. After a full statement of the facts, which it is needless to repeat, Mr. Justice Baldwin delivered this opinion: "Ought a court of equity, in a mining case, when it has been convinced of the importance thereof, for the purposes of the trial, to compel an inspection and survey of the works of the parties, and admittance thereto by means of the appliances in use at the mine? All the analogies of equity jurisprudence favor the affirmative of this proposition. The very great powers with which a court of chancery is clothed were given it to enable it to carry out the administration of nicer and more perfect justice than is attainable in a court of law. That a court of equity, having jurisdiction of the subject-matter of the action, has the power to enforce an order of this kind will not be denied; and the propriety of exercising that power would seems to be clear, indeed, in a case where, without it, the trial would be a silly farce. Take, as an illustration, the case at bar. It is notorious that the facts by which this controversy must be determined cannot be discovered except by an inspection of works in the possession of the defendant, accessible only by means of a deep shaft, and machinery operated by it. It would be a denial of justice, and utterly subversive of the objects for which courts were created, for them to refuse to exert their power for the elucidation of the very truth — the issue between the parties. Can a court justly decide a cause without knowing the 'facts; and can it refuse to learn the facts? But one adjudication of this subject can be found in the books, and this is in conformity with the views here expressed, viz., Bainbridge on Mines." (See 2d ed. 511, 512.)

The next case in point of time is that of *Stockbridge* v. *Cone Iron Works*, 102 Mass. 80, which was heard in the year 1869.

Chief Justice Chapman, in the opinion, says: "The plaintiffs complain that the defendants dug a shaft on their own land, near the line of the plaintiffs' land, and thence excavated drifts, extending under-ground, into the plaintiffs' land, and took out the ore which they found there. They ask that these drifts may be viewed. The order directs not only that the drifts may be examined by pumping the water out of the shaft, and going into it, and that the drifts may be examined which lead towards the plaintiffs' land, and also those which are under it, but that they may be cleared, so far as may be necessary, in order to ascertain what iron ore or other mineral has been taken from the land of the plaintiffs, and under the surface thereof, and that the viewers may do all acts that may be reasonably necessary to be done to effect the purposes of the decree." The expenses of the explorations amounted to the sum of $4,841.07, and were taxed against the defendants, with the costs. Upon this matter, the opinion says: "But courts of law have power to allow the reasonable expenses of surveys and views in proper cases, and the fee bill does not apply to the expense of such proceedings. Mines are so situated that special and peculiar proceedings are sometimes necessary in order to attain the reasonable ends of justice in regard to the under-ground passages by which access to them may be obtained by trespassers."

In the cases of *Thornburg* v. *Savage Min. Co. supra*, and *Stockbridge Iron Co.* v. *Cone Iron Works, supra*, no authorities relating to this discussion are cited in the opinions, and the briefs of the counsel are not reported. In the year 1877, the case of *Thomas Iron Co.* v. *Allentown Mining Co.* 28 N. J. Eq. 77, was determined. An order for the inspection of a certain mine was made upon the *ex parte* application of the complainants, and the defendants insisted that they should have had notice thereof, and an opportunity to be heard. The chancellor says: "In a case like the present, where the application is for the inspection of a worked-out and almost abandoned mine, to ascertain the extent of the workings merely, and it appears that leave has been refused, the granting of the order for inspection is, on the making out of a *prima facie* case entitling the complainant to it, almost a matter of course." After quoting from *Bennitt* v. *Whitehouse, supra*, and *Lewis* v. *Marsh, supra*, he concludes:

"If the granting of the order for inspection is a matter of course on a *prima facie* case, notwithstanding the sworn denial of the defendant, it would seem that it might, at the discretion of the court, be made without notice to the defendant. It is undoubtedly, however, the better practice to require notice, enjoining, in the mean time, so far as may be necessary to preserve the *status quo.*"

It will seem that the order of the court below followed an unbroken line of precedents. The rule of equity which has been enforced by the courts of England and America is not of statutory growth. In this State the legislative department has endowed the chancery practice involved in this hearing with the form of law. We are not called upon to decide that the District Courts of the State may make the order complained of, in the absence of any requirement of the Code of Civil Procedure. We can vindicate with absolute certainty the existence of the right to make an order for the inspection and survey of a lode mining claim, where the appropriate steps have been taken by interested parties. The authorities treat the proceedings as the proper mode of securing "the best evidence of which the case in its nature is susceptible." There is not an assertion or suggestion by any jurist that rights of property are impaired or transgressed by the making of the orders for an inspection and survey. For this reason, a bond to indemnify the persons whose property may be inspected is not asked for or required. But in *Bennett* v. *Griffiths, supra,* when authority was given for the destruction of a wall, to enable the viewers to perform their duty, the defendants testified that "it would be injurious to their mines if a gate road was driven through the wall; that the wall which had been erected was only the usual and proper wall, erected for the purpose of strengthening the gate road in that portion of the mine." Under these circumstances, the plaintiff was ordered to give security to save the defendants from any loss or damage resulting from the inspection.

We have stated that the power of the courts of England over this matter was exercised as a branch of their chancery jurisdiction. In 1854 the Common-law Procedure Act was enacted, and the fifty-eighth section provides that "either party shall be at liberty to apply to the court or a judge for a rule or order for

the inspection by the jury, or by himself, or by his witnesses, of any real or personal property, the inspection of which may be material to the proper determination of the question in dispute; and it shall be lawful for the court or a judge, if they or he think fit, to make such rule or order. . . . ." In the interpretation of this statute, the learned Chief Justice Cockburn, in *Bennett* v. *Griffiths, supra,* said : " The fifty-eighth section of the Common-law Procedure Act does not regulate the jurisdiction given to the courts of law by reference to that already exercised by the courts of equity; but we think that, as ancillary to the power of inspection given to the courts of common law, there is the same power given to remove obstructions, with a view to inspection, which was exercised by the courts of equity as ancillary to their power of ordering inspection."

The section of the Code under review does not empower any court or judge to grant an order that is fruitful of injustice or oppression. Whenever this is done, such action will exceed the authority that has been bestowed, and can be rightfully set aside. The bare fact that the St. Louis Mining and Milling Company of Montana petitions for an inspection and survey of the mining property referred to before its complaint has been filed is immaterial. The same object is to be attained at all times, regardless of the commencement of the suit, and that is the best evidence for the trial. In *State* v. *Seymour*, 35 N. J. L. 53, the court holds that the surveying and mapping of lands by legislative authority is not a taking thereof, and that it is not a trespass to go thereon for these purposes. In *Winslow* v. *Gifford*, 6 Cush. 327, it is held that an act of the legislature is not unconstitutional which authorized certain parties to enter upon private lands, and make surveys and establish boundaries; and Mr. Justice Dewey, in the opinion, says: "In effecting such an object, there may be, and often is, a brief, and, as it were, momentary interference with the absolute right of the owner of real estate. This exercise of power, in its various forms, is one of every day's occurrence; indeed, so common as to be acquiesced in without remonstrance, or even a question as to the right so to do."

The statute does not provide for an appeal from the order, which has been reviewed, and the writ of *certiorari* has been

properly issued upon the application of the Montana Company, Limited.

We are of the opinion that the District Court has not exceeded its jurisdiction in determining and granting the petition of the St. Louis Mining and Milling Company of Montana. It is therefore adjudged that the order and proceedings of the District Court be affirmed, with costs.

HARWOOD, J., and DE WITT, J., concur.